**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LABWARE, INC.,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **THERMO LABSYSTEMS, INC.,** | : | **No. 04-2545** |
| **Defendant.** | : | |

**MEMORANDUM AND ORDER**

Schiller, J.                                                                                    June 28, 2005

On June 10, 2004, Plaintiff Labware, Inc. ("LabWare") commenced this action against Defendant Thermo Labsystems, Inc. ("Thermo") for false advertising in violation of the Lanham Act and breach of contract in violation of Pennsylvania law. On April 26, 2005, the Court granted in part and denied in part the parties' cross-motions for summary judgment, leaving three issues for trial: (1) whether Thermo engaged in false advertising by misrepresenting the capabilities of one of its products; (2) whether Thermo engaged in false advertising by displaying an inaccurate bar graph; and (3) whether Thermo's breach of a settlement agreement caused LabWare to suffer compensable harm. (*See* Mem. & Order of Apr. 26, 2005 [hereinafter "Apr. 26 Order"] at 11.) After a bench trial on May 2 and 3, 2005, the Court now enters the following Findings of Fact and Conclusions of Law as required by Federal Rule of Civil Procedure 52(a).

## I.       FINDINGS OF FACT

### A.       The Parties

LabWare is a provider of complex software systems known as laboratory information management systems ("LIMS"). (R. at 24-27 (May 2, 2005).) LIMS are systems that capture and

manage laboratory data upon which companies can base key decisions, e.g., whether a particular product or good is ready to be released to the public.  (*Id.* at 27.)  Vance Kershner, LabWare's president, sole shareholder, and chief LIMS architect, founded LabWare in the late 1980s.  (*Id.* at 26, 114.)  Presently, LabWare has approximately 15 to 18 employees in the United States and 100 employees worldwide.  (*Id.* at 27.)

Thermo, formerly known as Innaphase Corporation ("InnaPhase"), is also a provider of LIMS.  (R. at 5-6 (May 3, 2005).)  InnaPhase was founded in 1997 and, at all relevant times,  Jo Webber functioned as the company's CEO.  (*Id.* at 5.)  In September of 2004, Thermo Electron Corporation acquired InnaPhase and changed InnaPhase's name to Thermo Informatics Inc.  (Apr. 26 Order at 1.)  Thereafter, Thermo Informatics Inc. merged into Thermo, leaving Thermo as the surviving entity.[1]  (*Id.*)  At the time of the acquisition, Thermo employed approximately 115 individuals worldwide.  (R. at 6 (May 3, 2005).)

LabWare's sole LIMS product, "LabWare LIMS," is generic, meaning that it is not designed specifically for a particular industry, but rather is adaptable and is marketed to a variety of industries that perform laboratory testing.   (R. at 29-30, 116 (May 2, 2005).)  Thermo, by contrast, markets LIMS products which are specifically designed for pharmaceutical companies.  (R. at 9-12 (May 3, 2005).)  In December of 2003, riding high on the success of a product called "Watson," Thermo released "Newton."  (*Id.* at 11-13.)  Watson, which was designed for the bioanalytical phase of the pharmaceutical testing process, "would come out of the box very rapidly, the customers could implement it very rapidly, and [Thermo was] very happy with it."  (*Id.* at 9-10.)  In creating Newton, Thermo hoped to take the Watson model "and apply it to the manufacturing space," a subsequent

---

[1] Hereafter, the Court will simply refer to Defendant as "Thermo."

phase of pharmaceutical testing related to quality control.  (*Id.* at 12; Apr. 26 Order at 6.)

**B.      The Schering-Plough Project**

In the spring of 2004, Schering-Plough Corporation ("Schering-Plough"), a publicly-traded pharmaceutical company, began to undertake a global LIMS project ("GLIMS Project").  (Trial Ex. 26 (Schering-Plough 2004 Annual Report); *see also* Trial Ex. 1 (Vendor Selection Report).)  The goal of the GLIMS Project was to increase compliance, consistency, and efficiency at Schering-Plough's pharmaceutical plants around the world.  (R. at 181 (May 2, 2005).)  The project required the acquisition of an "enterprise level" LIMS system, i.e., a system that "cross[es] a lot of the operational aspects of the business . . . [and] could potentially be used by thousands of people in the corporation to carry out their various activities in support of operation of the business."  (*Id.* at 28-29.)

LabWare and Thermo, among other companies, competed to serve as the LIMS vendor for Schering-Plough's GLIMS Project.  (*Id.* at 57; R. at 16 (May 3, 2005).)  Schering-Plough was already somewhat familiar with both LabWare and Thermo:  LabWare had been providing LIMS products and services to Schering-Plough since 1998, and Schering-Plough was a customer of Thermo's Watson product line.  (R. at 53 (May 2, 2005); R. at 15 (May 3, 2005).)  As both LabWare LIMS and Newton were designed to be enterprise level LIMS systems (R. at 12 (May 3, 2005)), these products became competing candidates to fill Schering-Plough's needs.

1.      *The Vendor Selection Process*

Schering-Plough engaged in a lengthy selection process before choosing a LIMS vendor.  (R. at 123 (May 2, 2005).)  This process involved meetings with potential vendors and demonstrations of the various LIMS products.  (*See id.* at 230-31.)  Within Schering-Plough, a "core team"

3

consisting of three individuals was responsible for choosing a vendor.  (*Id.* at 193-95.)  The core team, in turn, had a team of about 20-25 people who were responsible for evaluating and "kicking the tires" of the competing LIMS products.  (*Id.*)

During the selection process, LabWare had multiple opportunities to convince Schering-Plough to select LabWare LIMS.  (*Id.* at 124-30.)  For instance, in March of 2004, Kershner and other LabWare employees presented a Power Point demonstration and product demonstration to Schering-Plough employees in Brinny, Ireland.  (*Id.* at 124-28.)  Thereafter, LabWare engaged in additional, "off the record" dialogue with Schering-Plough about the GLIMS Project.  (*Id.* at 128-29.)  On March 30, 2004, LabWare submitted a bid for the project through a reverse online auction, an auction "sort of like E-Bay" in which Schering-Plough required all potential vendors to participate.  (*Id.* at 100-03.)  LabWare's initial bid consisted of approximately $2.7 million in license fees, $404,000 in annual maintenance fees, and $2.15 million in professional services fees.  (Trial Ex. 30 (LabWare's Auction Bid of Mar. 30, 2004).)  LabWare soon learned, however, through a "leak" by a Schering-Plough employee, that Schering-Plough had decided to reject its bid.  (*See* R. at 105-06 (May 2, 2005).)  This leak prompted LabWare to make an offer to reduce the bid substantially.[2]  (*See* Trial Ex. 10 (Letter of Apr. 22, 2004); Trial Ex. 11 ((Letter of Apr. 23, 2004).)

Thermo also had ample opportunity to entice Schering-Plough to gravitate to Newton.  In

---

[2] More specifically, on April 22, 2004, Kershner wrote a letter to Michael Power of Schering-Plough in which he offered to waive LabWare's professional services fees, a reduction of approximately $2.15 million.  (Trial Ex. 10.)  The next day, Keith Wipprecht wrote a letter to Power in which he further reduced LabWare's bid:  Wipprecht offered to waive LabWare's annual maintenance fees for the first five years (a discount worth approximately $2 million), reduce its license fees by approximately $200,000, and reduce its annual maintenance fees by $25,000 per year.  (Trial Ex. 11.)  Thus, over the course of two days, LabWare effectively reduced its initial bid for the GLIMS Project by over $4 million.

February or March of 2004, representatives of Thermo met with representatives of Schering-Plough in Brinny, Ireland.  (R. at 17 (May 3, 2005).)   Thermo, like LabWare, gave a Power Point demonstration and a product demonstration while in Brinny.  (*Id.* at 17-20.)  Webber, Thermo's CEO, provided the product demonstration, while John Weisbecker, a member of the GLIMS Project "core team," led the group through Schering-Plough's demonstration script.   (*Id.* at 17-19.) Following the Brinny meeting, Thermo submitted a bid for the GLIMS Project, presumably through the reverse online auction.  (*See* Trial Ex. 1 at 9 (setting forth cost estimates from Thermo and LabWare).)  Thermo's bid consisted of approximately $2.5 million in license fees, $425,000 in annual maintenance fees (with no maintenance fees to be charged during the first year), and $439,000 in professional services fees. (*Id.*)  According to Schering-Plough's calculations, this bid was over $2 million less than LabWare's initial bid.  (*Id.*)

After receiving Thermo's bid, Schering-Plough sent members of the GLIMS Project team to Thermo's headquarters in Philadelphia.  (Trial Ex. 20 (Agenda for Thermo/Schering-Plough April 2004 Meetings).)   These team members spent the week of April 12, 2004 participating in demonstrations of Newton and reviews of Newton's functionality.  (*See* R. at 228-34 (May 2, 2005).) Using detailed checklists, the team members recorded whether Newton satisfied Schering-Plough's numerous user requirements.  (*Id.* at 231-32; *see also* Trial Ex. 21 (Checklist of Schering-Plough User Requirements).)   The checklists had four columns, in which Schering-Plough could note whether a particular feature was available in Newton "out of the box" (i.e., without any additional development); would require Newton to be "configured"; would require Newton to be "customized"; or was simply "not available" in Newton.  (*Id.*)  Based on these determinations, Schering-Plough reached conclusions as to Newton's functionality and suitability for the GLIMS Project.  (R. at 233-

34 (May 2, 2005); *see also* Trial Ex. 1 at 11 (stating Schering-Plough's conclusion that Version 1.1 of Newton could meet 64% of Schering-Plough's user requirements "out-of-the-box").)

   2. *Thermo's Representations About Newton*

  While competing for the GLIMS Project, Thermo made various representations to Schering-Plough regarding Newton's capabilities. Specifically, Thermo represented that Newton was a "built for purpose application" which could be implemented and validated faster and cheaper than generic LIMS systems, such as LabWare LIMS. (R. at 174, 219-20 (May 2, 2005).) Thermo made these statements in presentations and software demonstrations, and Webber made them personally in discussions with Schering-Plough representatives. (*Id.* at 168.) Moreover, during its Brinny, Ireland Power Point presentation, Thermo displayed a chart claiming that Newton could be implemented and validated in less than half the time required for "commercial" LIMS systems like LabWare's. (Trial Ex. 2 (Thermo's Brinny, Ireland Presentation for Schering-Plough) at 11; *see also* R. at 169 (May 2, 2005); R. at 20-23 (May 3, 2005).)

  According to David Kaufman and James Clark, two GLIMS Project team members, these representations proved "very important" to Schering-Plough. (R. at 175-76, 220 (May 2, 2005).) By asserting that Newton was "built for purpose," Thermo was offering an approach that Clark considered "very novel." (*Id.* at 221.) As Clark explained, these statements "really piqued [Schering-Plough's] interest" because "[m]ost LIMS applications that you find out in the market do take a long time to implement. . . . They're generic types of systems, so you have to then program, or develop, or configure those systems to meet your user requirements, and that takes a long time." (*Id.*) Newton was appealing because it "was supposed to be . . . a truly configurable system. You wouldn't have to do a lot of that." (*Id.*) As Kaufman pointed out, Schering-Plough was interested

in finishing the GLIMS Project sooner and for less cost because the project had the potential to take four years to complete and to cost over $50 million.  (*Id.* at 176.)  As a result, these representations about Newton influenced Schering-Plough's "buying decision."  (*Id.* at 220-21.)

Thermo's representations, however, were not unfounded.  At that time, creating a "built for purpose" system was Thermo's "raison d'etre."  (R. at 20-21 (May 3, 2005).)  Thermo had previously observed that generic LIMS systems, including its own Lab Manager product, took too long to implement and validate.  (*Id.* at 21.)  Watson, by contrast, could be implemented "in typically around two to three weeks," which made validation "so much easier."  (*Id.*)  Newton, like Watson, was aimed specifically at the pharmaceutical industry, so as to come "out of the box" with pharmaceutical data like excipients, drug substances and raw materials already in place.  (*Id.* at 14-15.)  In part, Thermo assessed Newton's abilities through internal product testing, including validation, unit and stress tests.  (*Id.* at 22, 46-47.)  Thermo largely relied, though, on its prior success with Watson.  (*Id.* at 22-23.)

Newton and Watson are, of course, distinct products.  (R. at 51-52 (May 2, 2005).)  For instance, Newton is a Java based application, whereas Watson is written in Visual Basic.  (R. at 36, 40-41 (May 3, 2005).)  In addition, Watson covers only the bioanalytical portion of research and development, while Newton covers "the whole manufacturing side of the house."  (R. at 54 (May 2, 2005).)  Nonetheless, the products are both database systems based on enterprise level technology. (R. at 12 (May 3, 2005).)  More importantly, both products were designed to meet the particular needs of the pharmaceutical industry, and contained pre-built functionality intended to alleviate testing burdens unique to that industry.  (*Id.* at 12, 19.)  Accordingly, it was natural for Thermo to look to Watson to make predictions about Newton.

7

Furthermore, Schering-Plough personnel understood that Thermo's statements about Newton were, in fact, predictions rather than guarantees.  As Webber explained, the GLIMS Project team members were "extremely smart people, they knew they were looking at a Version 1.0 product . . . they were Watson customers anyway so they knew the company, they knew [Thermo] for a number of years." (*Id.* at 23-24.)  In other words, Schering-Plough personnel were well aware that Newton was a new and unproven product.  (R. at 196-97, 208, 236 (May 2, 2005); *see also* Trial Ex. 1 at 14 (noting that Newton was risky because it was "new and unproven").)  In fact, Newton had not yet been implemented anywhere.  (R. at 236 (May 2, 2005).)  Had Thermo guaranteed that Newton would be implemented and validated within a certain time frame, Schering-Plough would not have believed this assertion.  (R. at 29-30 (May 3, 2005).)  All Thermo could successfully assert was that, in its opinion, Newton would fulfill Schering-Plough's implementation and validation needs.  (*Id.*)

### 3.    *Schering-Plough's Selection of Thermo*

On May 7, 2004, Schering-Plough awarded Thermo a contract in connection with the GLIMS Project.  (R. at 189-90 (May 2, 2005).)  Under this contract, Schering-Plough was to pay Thermo $320,000 for Newton licenses for use in the project's "proof-of-concept" phase.  (*Id.*; *see also* Trial Ex. 5 (Contract of May 7, 2004).)  The purpose of this phase was to examine Newton's design and development thoroughly to ensure that the product met Schering-Plough's business needs and to gain a better foundation for estimating its total costs.  (R. at 190-91 (May 2, 2005).)  It was Schering-Plough's "expectation" that, after completion of the proof-of-concept phase, it would continue on to development and implementation of Newton.  (*Id.* at 224-25.)  Nonetheless, the proof-of-concept phase was "definitely necessary," and Schering-Plough did not plan to decide whether to enter into a long-term contract with Thermo until after completion of that phase.  (*Id.* at 191.)

8

Schering-Plough selected Thermo, rather than LabWare, based on Thermo's performance in three dimensions: strategic fit, cost and risk.  (*Id.* at 194; *see also* Trial Ex. 1 at 2-3.)  Of these dimensions, Thermo earned a "most favorable" rating on strategic fit and cost and an "average" rating on risk; LabWare rated "average" on strategic fit, "least favorable" on cost, and "most favorable" on risk.  (Trial Ex. 1 at 3.)  Schering-Plough's vendor selection report concluded that Thermo "is the recommended vendor as it is the highest strategic fit and lowest cost solution, provided associated risks can be mitigated," and that "LabWare is the second vendor of choice, if Schering-Plough believes that the . . . risks [associated with Thermo] cannot be mitigated."  (*Id.* at 10.)  The report further explained that while Newton was a "new and unproven product" which "[l]everages knowledge base and experience from . . . Watson LIMS,"  it was "specialized for the pharmaceutical industry" and had a "[p]otentially shorter time to develop, deploy and maintain." (*Id.*)  LabWare LIMS, by contrast, was a "[p]roven product" but was "costly to acquire and deploy" as well as "difficult to learn and use."  (*Id.*)

In reaching these conclusions, Schering-Plough took into account LabWare's willingness to make substantial reductions to its initial bid.  (R. at 166-67 (May 2, 2005); *see also* Trial Ex. 10.)  When LabWare made this offer, Schering-Plough had already decided to select Thermo over LabWare.  (R. at 167 (May 2, 2005).)  Schering-Plough ultimately stayed with Thermo, its initial choice, because it "still believed at that time that [Thermo] had a very novel approach to the LIMS market in coming forth with a product that was easily configurable, very user friendly, and would over its lifetime of use in Schering-Plough be much better and cheaper and faster."  (*Id.*)  The "novel approach" offered by Thermo was "out-of-box functionality, so the package came with a lot of pre-configured tools as well as configuration that allowed [Schering-Plough] to implement what [it]

9

needed to faster." (*Id.* at 167-68.)  Accordingly, Schering-Plough decided to proceed with Thermo.

        4.     *Attempted Execution of the Project*

Schering-Plough, however, soon experienced problems with Newton. (*Id.* at 174.)  Schering-Plough had difficulty installing Newton and also had trouble with the response time, i.e., "the amount of time it would take the system to come back after you hit the enter key after a number of people logged into the system." (*Id.* at 174-75.)  The system was "locking up" with only ten people on it, which was a "serious" issue because Schering-Plough was "looking at putting hundreds [of people] on." (*Id.* at 177.)  The slow response time led Kaufman to believe that Thermo had failed to properly stress test Newton and that the product was not "ready for the market." (*Id.* at 176-77.)  Clark, similarly, indicated that had he been fully aware of "the level of immaturity of the application," he would not have recommended that Schering-Plough acquire Newton. (*Id.* at 226-27.)

In an effort to fix these problems, Schering-Plough hired an outside consulting firm, Wiley Technologies ("Wiley"). (*Id.* at 175.)  Wiley was able to pinpoint "some of the problems which [Thermo] was able to respond to and correct." (*Id.*)  Schering-Plough never reviewed Wiley's final report, however, because in September of 2004, Newton was discontinued. (*Id.* at 163, 177.)  The reason for the discontinuation lay not in the product's performance issues, but rather in Thermo Electron Corporation's concern that Newton "would compete with Sample Manager, which is [Thermo Electron Corporation's] flagship generic LIMS solution." (R. at 27 (May 3, 2005).)  Although Schering-Plough "[wasn't] very satisfied" with Newton's performance to that point, the news of the product's withdrawal came as a shock. (R. at 226 (May 2, 2005).)

10

5.      *The Future of the Project*

Following Newton's discontinuation, Schering-Plough reopened the bidding process for the GLIMS Project.  (*Id.* at 96.)  Schering-Plough again invited LabWare to submit a bid through a reverse online auction.  (*Id.*)  On November 1, 2004, LabWare submitted such a bid, which consisted of approximately $2.3 million in license fees, $322,700 in annual maintenance fees, and $1.76 million in professional services fees.  (Trial Ex. 29 (LabWare's Auction Bid of Nov. 1, 2004).)  LabWare's November 1, 2004 auction bid was lower than its March 30, 2004 auction bid.  (*Compare* Trial Ex. 29 *with* Trial Ex. 30.)  The second bid was lower because LabWare "was operating under the basis that the price mattered," which meant that LabWare "had to sharpen [its] pencil."  (R. at 78-79 (May 2, 2005).)  A contract was not signed immediately, and the bid figures remained subject to negotiation.  (*See id.* at 100.)

On April 11, 2005, Schering-Plough and LabWare entered into a contract in connection with the GLIMS Project.  (Trial Ex. 7 (Contract of April 11, 2005).)  The goal of the contract is to "finish the specify phase," i.e., to "complet[e] the work that didn't get finished when Newton was withdrawn."  (*See* R. at 81, 227 (May 2, 2005).)  As Kershner explained, this means that LabWare is merely refining Schering-Plough's user requirements "to understand what user requirements would actually be implemented if they were going to implement a global LIMS Project . . . so that there's a document, as a deliverable, which documents what their requirements really are."  (*Id.* at 81.)  Under the contract, LabWare is to be paid $404,202 for consulting services only; at this time, Schering-Plough has not purchased any licenses from LabWare.  (*Id.* at 80, 83, 90.)

In sum, the future of the GLIMS Project remains up in the air.  Kershner has no expectation that Schering-Plough will actually implement a global LIMS system.  (*Id.* at 81-82.)  Kaufman,

11

moreover, feels that the project's future is uncertain "as it has gone on for quite a while now with not a lot to demonstrate, and the [Schering-Plough] Board of Directors are not going to look at it very favorably." (*Id.* at 178.)  On the other hand, Weisbecker, who is the GLIMS Project's current director, believes that Schering-Plough will continue the project with LabWare as the LIMS vendor. (*Id.* at 255.)  Clark also thinks that Schering-Plough will acquire and implement LabWare LIMS, so long as this initial, "specify phase" is successful.  (*Id.* at 227-28.)  There is no question that the business need for the GLIMS Project, i.e., to increase compliance, consistency, and efficiency, still exists today.  (*Id.* at 181.)

      **C.**     **The ARC Graph**

      In the course of competing for the GLIMS Project, Thermo displayed a bar graph (the "ARC Graph") depicting the relative market shares of LIMS vendors in the pharmaceutical industry.  (*See* R. at 170-71.)  This graph was originally published by ARC Advisory Group ("ARC"), an independent market research firm, as part of a report entitled "Laboratory Information Management Systems ("LIMS") Worldwide."  (Trial Ex. 14 (ARC Report).)  The ARC Graph reflects ARC's assessment that, in 2003, the global pharmaceutical industry spent $89.7 million on LIMS products and services.  (*Id.* at figure 3-9.)  The ARC Graph then lists ten LIMS suppliers in order of ARC's estimations as to their share in that market.  (*Id.*)  Thermo is ranked first, with a market share of 26.0% (or $23.3 million), while LabWare is ranked eighth, with a market share of 2.8% (or $2.5 million). (*Id.*)

      The market share percentages attributed to Thermo and LabWare on the ARC Graph are inaccurate.  Although the inexactness of market research makes it almost impossible to reach precisely correct percentages, ARC erred by a significant amount.  First, with respect to LabWare,

Kershner asserts that, in 2003, the company's revenues from the pharmaceutical industry were just under $19 million. (R. at 47 (May 2, 2005).) Thus, according to Kershner's calculations, LabWare's market share percentage should have been represented as approximately 21.0% on the ARC Graph, a far cry from 2.8%.[3] (*See* Trial Ex. 14 at figure 3.9.)   Second, with respect to Thermo, the company's former CFO estimates that, in 2003, Thermo's revenues from the pharmaceutical industry were $18.5 million. (R. at 259 (May 2, 2005).) These revenues were calculated on a *pro forma* basis, which means that they include the benefits of a mid-year asset acquisition and could be overstated. (*See id.* at 258-62.) But even accepting the $18.5 million figure as correct, Thermo's market share percentage should have been approximately 20.6%, rather than 26.0%. (*See* Trial Ex. 14 at figure 3.9.) Had ARC represented Thermo's market share as 20.6% and LabWare's market share as 21.0%, LabWare would not only have ranked first instead of eighth, but also would have ranked ahead of Thermo.

Nonetheless, there is no indication that the ARC Graph played a role in Schering-Plough's decision to choose Thermo over LabWare. Schering-Plough's only opportunity to view the graph was on one slide of a thirty-one page Power Point presentation. (R. at 170-71 (May 2, 2005); *see also* Trial Ex. 2 at 16.) Kaufman testified that, upon seeing this slide, Schering-Plough concluded that Thermo was "larger in the LIMS market than we had anticipated, which gave us a foundation of credibility with the vendor." (R. at 171 (May 2, 2005).) Credibility was, in Kaufman's opinion, "very important." (*Id.*) Yet, it was hardly news to Schering-Plough that Thermo had a credible

---

[3] Thermo protests that Kershner's calculations of LabWare's revenues are not reliable because LabWare has no "certified" financial statements. (*See* R. at 115 (May 2, 2005).) The Court, however, sees no reason to discredit the estimates of the company's president and founder, particularly given the fact that he employs a CPA to prepare LabWare's financial statements each year. (*Id.*)

presence in the pharmaceutical LIMS market, as Schering-Plough was already a customer of Thermo's Watson product line.  (R. at 15 (May 3, 2005).)  Moreover, the GLIMS Project representatives were "sophisticated people" who chose Thermo pursuant to a complex assessment of strategic fit, cost, and risk.  (*Id.* at 30-23; Trial Ex. 1 at 2-3.)  Schering-Plough's vendor selection report recommends Thermo for the project not because of any general marketing claims about "credibility," but because Thermo offered "the highest strategic fit and lowest cost solution" and had a product that was "specialized for the pharmaceutical industry."  (*Id.* at 10.)  In fact, the vendor selection report does not even *mention* the ARC Graph, let alone indicate that the graph influenced Schering-Plough's purchasing decision.  Thus, any error in the ARC Graph had a negligible effect on Schering-Plough's selection process.

### D.     The Settlement Agreement

Finally, unrelated to either Schering-Plough or the GLIMS Project, LabWare and Thermo entered into a January 15, 2004 settlement agreement.  (Trial Ex. 9 (Settlement Agreement).)  The settlement agreement resolved a prior false advertising action initiated by LabWare against Thermo in this Court.  (*Id.*)  Under the terms of the settlement agreement, Thermo agreed to refrain from representing that "more pharmaceutical companies rely on our LIMS solutions than all other LIMS suppliers combined."  (*Id.*)  On June 18, 2004, however, Thermo repeated this exact statement to Mylan Laboratories, Inc. ("Mylan"), in violation of the settlement agreement.  (Trial Ex. 53 (Presentation for Mylan) at 11; *see also* Apr. 26 Order at 19-20.)

Kershner testified that, by publishing statements prohibited by the settlement agreement, Thermo was attempting to position itself "in a competitive position where they wouldn't otherwise have been."  (R. at 140 (May 2, 2005).)  He further testified that Thermo's publication of such

statements resulted in a "loss of goodwill." (*Id.* at 141.)  Kershner could not, however, "identify a specific loss of a particular sale as a result of [Thermo] making those statements." (*Id.* at 140.)

## II.   CONCLUSIONS OF LAW

LabWare's false advertising claims arise from:  (1) Thermo's representations about Newton's capabilities; and (2) Thermo's use of the ARC Graph.  LabWare's breach of contract claim arises from Thermo's violation of the parties' January 15, 2004 settlement agreement.  The Court will address the merits of each claim in turn.

### A.      LabWare's False Advertising Claims

Section 1125(a)(1) of the Lanham Act proscribes any "false or misleading description of fact, or false or misleading representation of fact" which "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities."  15 U.S.C. § 1125(a)(1) (2005).  To recover under this section of the Lanham Act, a plaintiff must establish the following elements by a preponderance of the evidence: (1) the defendant has made a false or misleading statement regarding a product; (2) there is either actual deception or a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff.[4]  *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 129 (3d Cir. 1994).  To demonstrate the first two elements, a plaintiff must show either that the statement was literally false

---

[4] Here, there is no dispute as to element four, i.e., that Thermo's advertised goods traveled in interstate commerce.

or that it was deceptive. *Id.*; *see also Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993) ("[A] plaintiff must prove *either* literal falsity *or* consumer confusion, but not both.") (emphasis in original).

          1.     *Newton*

First, LabWare contends that Thermo violated the Lanham Act by misrepresenting Newton's implementation and validation capabilities. Although Thermo made these statements to several potential customers (*see* Apr. 26 Order at 16-17), LabWare has focused entirely on Thermo's representations to Schering-Plough during the GLIMS Project vendor selection process. LabWare complains that, throughout the selection process, Thermo misrepresented to Schering-Plough that Newton could be implemented and validated faster and cheaper than LabWare LIMS. The Court finds, however, that LabWare has failed to prove the first two elements of its claim, i.e., that the statements were either literally false or deceptive. *See Castrol*, 987 F.2d at 943. Accordingly, the Court holds that Thermo's conduct did not violate the Lanham Act.

          a.     Literal Falsity

If a plaintiff proves that an advertisement is "literally false," a court may grant relief "without considering whether the buying public was actually misled." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (citation omitted). "A determination of literal falsity rests on an analysis of the message in context." *Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d at 129 (citation omitted). In this case, placing Thermo's statements in context reveals that the statements were not literally false. Thermo's assertion that Newton, a brand new "built for purpose" system, would be implemented and validated more rapidly than LabWare LIMS, a "generic" system, was a mere prediction. (*See* R. at 23-24, 29-30 (May 3,

2005).)  At that time, Newton was an unproven product which had not been implemented anywhere. (R. at 236 (May 2, 2005).)  Thus, when these representations were made, Newton's actual capabilities were still unclear.  Furthermore, there is no proof that, in fact, Newton could *not* be implemented and validated in the time Thermo predicted.  Although Schering-Plough experienced delays in installing Newton, these problems arose during the preliminary "proof-of-concept" phase, not during the implementation phase.  (*Id.* at 174, 224-25.)  In retrospect, at least one Schering-Plough employee does not believe that Thermo's statements about Newton were true.  (*See id.* at 179.)  Yet, there is simply no concrete evidence to show that the statements were false.

LabWare argues that Thermo's representations were "completely unsubstantiated," and therefore *per se* false.  In general, the Lanham Act plaintiff "bears the burden of showing that a challenged advertisement is false or misleading, not merely that it is unsubstantiated by acceptable tests or other proof."  *Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 228 (3d Cir. 1990) (citation omitted).  Nevertheless, the Third Circuit has held that "a court may find that a *completely* unsubstantiated advertising claim by the defendant is *per se* false without additional evidence from the plaintiff to that effect."  *Novartis*, 290 F.3d at 590 (emphasis added).  Thermo's statements about Newton, however, cannot be described as "completely unsubstantiated."  *Novartis* involved a Lanham Act claim against an antacid manufacturer that advertised one of its products as "nighttime strength."  *Id.* at 583-84.  In upholding the district court's determination that this advertisement was *per se* false, the Third Circuit noted that the manufacturer "[did] not argue or present any evidence to show that [its product] was specifically formulated for night time heartburn or that its product actually remedies heartburn at night more effectively than heartburn during the daytime."  *Id.* at 590.  Here, by contrast, Thermo has both argued and presented evidence to show

17

that it specifically designed Newton to work more rapidly than generic LIMS systems.  (*See, e.g.*, R. at 14-15, 19-23 (May 3, 2005).)  Thermo modeled Newton after one of its previous LIMS products, Watson, which was also created for the pharmaceutical industry and could indeed be implemented at a heightened speed.  (*Id.* at 20-23.)  Thermo's prior experience with Watson, along with the internal product tests conducted on Newton, provided Thermo with more than sufficient substantiation for its representations.  *See, e.g.*, *Accu-Sort Sys., Inc. v. Lazerdata Corp.*, 820 F. Supp. 928, 932 n.7 (E.D. Pa. 1993) (finding that general familiarity with laser scanning industry technologies was enough to "substantiate" representations in industry brochure).  Therefore, the Court concludes that the representations were not *per se* false.

> b.    Actual Deception

Having failed to show literal falsity, LabWare must prove actual deception.  *See Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 171 (3d Cir. 2001).  LabWare "cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react."  *Id.* (quotation omitted); *see also Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d at 130 ("The factfinder must determine whether the public was, in fact, mislead.")  Schering-Plough's reaction to Newton demonstrates that the company was not remotely deceived by Thermo's representations about implementation time.  The GLIMS Project team members were "extremely smart people" who understood that Newton was a new and unproven product and that Thermo's statements were merely predictions.  (*See* R. at 196-97, 208, 236 (May 2, 2005); R. at 23-24 (May 3, 2005).)  During the week of April 12, 2004, the team members undertook to test Newton themselves by sending representatives to Thermo's headquarters to conduct an assessment of the product's functionality. (R. at 228-34 (May 2, 2005).)  Following this week-long assessment, the team members prepared

a vendor selection report, recommending that Thermo be selected over LabWare.  (Trial Ex. 1.)  The

report conveys Schering-Plough's understanding that Newton was new and unproven and that it

"[l]everages knowledge base and experience from . . . Watson LIMS." (*Id.* at 10.)  The report further

notes that, with Newton, there was only a "[p]otentially shorter time" for development, deployment,

and maintenance.  (*Id.*)  Schering-Plough, of course, was familiar with how Thermo's LIMS products

worked, for Thermo had previously sold them Watson.  (R. at 23-24 (May 3, 2005).)  All of this

evidence shows that, far from being deceived or mislead by Thermo's statements, Schering-Plough

fully and accurately understood them.

Thus, LabWare has not proven either literal falsity or actual deception, the first two elements

of its claim.  *See Castrol*, 987 F.2d at 943.  As a result, without proceeding to the remaining

elements, the Court must conclude that Thermo's representations about Newton did not violate the

Lanham Act.[5]

_____

[5] Notably, even if Thermo had violated the Lanham Act, it is far from clear that LabWare could have recovered monetary damages on this claim.  LabWare argues that it was damaged by Thermo's representations about Newton because those representations caused LabWare to lose the GLIMS Project.  Yet, a plaintiff may only recover lost profits for a Lanham Act violation if "it is reasonably certain that such profits would have been realized except for the tort and that the lost profits can be ascertained and measured from the evidence introduced with reasonable certainty." *F.B. Leopold Co. v. Roberts Filter Mfg. Co.*, Civ. A. No. 92-2427, 1995 WL 704975, at *2, 1995 U.S. Dist. LEXIS 17639, at *4-5 (W.D. Pa. June 26, 1995); *see also Pioneer Leimel Fabrics, Inc. v. Paul Rothman Indus., Ltd.*, Civ. A. No. 87-2581, 1992 WL 73012, at *13, 1992 U.S. Dist. LEXIS 4187, at *35 (E.D. Pa. Mar. 31, 1992); *Donsco, Inc. v. Casper Corp.*, 205 U.S.P.Q. 246, 248 (E.D. Pa. 1980).

It would have been extremely difficult, if not impossible, to determine LabWare's lost profits with reasonable certainty.  LabWare, despite being initially passed over, has now been chosen for the GLIMS Project.  (R. at 79 (May 2, 2005).)  Although the project's status remains uncertain, there is ample evidence to suggest that Schering-Plough plans to see it to fruition. (*See id.* at 227-28, 255.)  If Schering-Plough does proceed with the project, then it will likely enter into a new contract with LabWare, the terms and fees of which have yet to be determined. (*See id.* at 100.)  Alternatively, even if Schering-Plough does not proceed with the project, it has already awarded LabWare an initial contract which is similar to the first and only contract

2.      *The ARC Graph*

Second, LabWare contends that Thermo violated the Lanham Act by displaying the ARC

Graph to Schering-Plough and other potential customers.   LabWare asserts that the graph

misrepresented the relative market shares of Thermo and LabWare in the global pharmaceutical

LIMS market.   LabWare has clearly established the first two elements of its claim by showing that

the ARC Graph was literally false.  *See Castrol*, 987 F.2d at 943 (stating that the first two elements

require a plaintiff to prove *either* literal falsity *or* consumer confusion, but not both).  LabWare has

not, however, proven either that the ARC Graph's message was "material" or that the graph resulted

in any injury.  Accordingly, the Court holds that Thermo's use of the ARC Graph did not violate the

Lanham Act.

a.      Literal Falsity

As explained above, determining whether an advertisement is literally false "rests on an

analysis of the message in context."  *Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d at 129 (citation

omitted).  An examination of the ARC Graph's message in context reveals that this message was,

indeed, literally false.  The ARC Graph ranks LabWare seven places below Thermo, and eighth out

of ten companies, for market share size in the global pharmaceutical LIMS market.  (Trial Ex. 14 at

figure 3-9.)  LabWare has demonstrated that, even in the imprecise world of market research, these

rankings are grossly inaccurate.  LabWare's market share, for instance, should have been as high as

21.0%, almost ten times greater than the figure stated on the ARC Graph.  (*See* R. at 47 (May 2,

---

awarded to Thermo.  (*See id.* at 81, 190, 227.)  As there is no guarantee that Schering-Plough
would have awarded Thermo any further contracts for the GLIMS Project (*see id.* at 191), the
Court is dubious of LabWare's assertion that it "lost" such contracts.  In sum, calculating
LabWare's alleged damages would have been a speculative endeavor.

2005).)  Thermo's market share, in turn, should have been no greater than 20.6%, which would have ranked Thermo directly below LabWare instead of seven places above LabWare.  (*See id.* at 259.) Naturally, the graph was not intended to be an exact calculation of market share percentages, but merely a general statement about market presence.  Regardless, the graph made the false claim that Thermo's presence in the LIMS market was far greater than LabWare's.

The Court thus finds that the ARC Graph was literally false, which means that LabWare has satisfied the first two elements of the Lanham Act.

b.      Materiality and Injury

Yet, LabWare also had to show that the ARC Graph's message was "material," in that it was "likely to influence the purchasing decision." *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922 (3d Cir. 1990).  The materiality inquiry "focuses on whether the false or misleading statement is likely to make a difference to purchasers." *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 312 n.10 (1st Cir. 2002) (*citing* J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 27:35 (4th ed. 2001)).  The ARC Graph was not likely to make a difference to sophisticated LIMS customers, such as Schering-Plough. According to Webber, these customers "are extremely strong technical folk and very understanding of the environment and would not look so much at the marketing claims but [would] really analyze the products." (R. at 31 (May 3, 2005).)  Webber also testified that there are less sophisticated LIMS customers who "may be more swayed by general marketing because they are less knowledgeable about the specific product area they're looking at." (*Id.* at 31-32.)  There is no evidence, however, that even these less sophisticated customers would have considered the ARC Graph important enough to influence their purchasing decisions.  In other words, even if these customers could be

21

swayed by "general marketing," there is nothing to indicate that the ARC Graph, a simple ranking of market shares, was likely to sway them.

Similarly, there is nothing to suggest that the ARC Graph did, in fact, influence any customers, thereby causing injury to LabWare.  Typically, the final element of a Lanham Act claim requires proof of "a likelihood of injury to the plaintiff in terms of declining sales, [or] loss of good will."  *U.S. Healthcare*, 898 F.2d at 922-23.  But where, as here, a plaintiff seeks monetary rather than injunctive relief, the plaintiff must show "actual damages rather than a mere tendency to be damaged."  *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 575 (E.D. Pa. 1999) (citation omitted); *see also Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648 (3d Cir. 1958).  Actual damages cannot exist without a nexus between a false advertisement and an adverse purchasing decision.  *See Synygy*, 51 F. Supp. 2d at 577; *see also IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 376 (5th Cir. 2002) (same).

LabWare has not proven that it was injured because it has not demonstrated a link between the ARC Graph and any adverse purchasing decision.  At trial, LabWare presented evidence of only one adverse purchasing decision:  Schering-Plough's initial selection of Thermo over LabWare for the GLIMS Project.  This decision was not affected by the ARC Graph.  Schering-Plough chose Thermo based on an in-depth evaluation of strategic fit, cost, and risk (*see* Trial Ex. 1), not based on a graph that appeared on one slide of a thirty-one page Power Point presentation (*see* Trial Ex. 2 at 16).  Once again, the GLIMS Project representatives were "sophisticated" people who had worked with Thermo "for a number of years."  (R. at 23-24, 30 (May 3, 2005).)  Through their own detailed analysis, they reached the conclusion that Thermo "had a very novel approach to the LIMS market in coming forth with a product that was easily configurable, very user friendly, and would

22

over its lifetime of use in Schering-Plough be much better and cheaper and faster." (R. at 167 (May 2, 2005).)  They believed so strongly in Newton's potential that, even when LabWare offered to substantially reduce its price, they still decided to proceed with Thermo.  (*Id.*)  Simply put, there is no doubt as to why Thermo was chosen over LabWare, and there is nothing to connect the ARC Graph to that choice.

As LabWare has not proven that the ARC Graph was material or that it caused any injury, the Court concludes that Thermo's use of the graph did not violate the Lanham Act.[6]  *See, e.g.*, *Synygy*, 51 F. Supp. 2d at 577.

## B.    LabWare's Breach of Contract Claim

Finally, LabWare claims that Thermo violated the terms of the parties' January 15, 2004 settlement agreement, thus entitling LabWare to compensatory damages.  Settlement agreements are governed by basic contract principles.  *Flemming v. Air Sunshine, Inc.*, 311 F.3d 282, 289 (3d Cir. 2002).  Under Pennsylvania law, which undisputedly applies here, the elements of a claim of breach of contract are: (1) the existence of a contract, including its essential terms; (2) a breach of duty imposed by the contract; and (3) resultant damages.  *See Corestates Bank v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999).  On summary judgment, this Court found that LabWare had proven the first two elements of its breach of contract claim, as Thermo conceded that it had breached a duty imposed by the parties' settlement agreement. (Apr. 26 Order at 19-20.)  At trial, however, LabWare had to prove that it suffered harm from Thermo's breach; otherwise, LabWare would recover only

_____

[6] Again, even if LabWare had proven a Lanham Act violation, LabWare's ability to recover monetary damages would have been in question.  (*See* discussion *supra* Part II(A)(1) n.5.)

nominal damages.  (*Id.* at 20.)

LabWare has failed to submit the requisite proof of harm.  Although Kershner testified that Thermo's breach caused LabWare to lose "goodwill," he could not "identify a specific loss of a particular sale."  (R. at 140-41 (May 2, 2005).)  There is at least some precedent to suggest that a plaintiff who asserts a claim for breach of contract may seek goodwill damages.  *See AM/PM Franchise Ass'n v. Atl. Richfield Co.*, 584 A.2d 915, 924-26 (Pa. 1990) (dispensing with earlier rule that categorically precluded plaintiffs from seeking goodwill damages for breach of warranty).  Nevertheless, the plaintiff must still introduce sufficient evidence to establish that the loss was "causally related" to the breach, and to provide the trier of fact "with a reasonable basis from which to calculate damages."  *Id.* at 926.  As LabWare has presented absolutely no such evidence here, the Court awards LabWare nominal damages only.  *See Albert Rolland, S.A. v. Smithkline Beckman Corp.*, Civ. A. No. 85-3217, 1990 WL 90492, at *1, 1990 U.S. Dist. LEXIS 7894, at *3-4 (E.D. Pa. June 27, 1990) (collecting cases and concluding that "[t]he case law is clear that where a plaintiff can prove a breach of contract but can show no damages flowing from the breach, the plaintiff is entitled to recover nominal damages").

The Court further finds that the nominal damages award shall equal one dollar and shall entitle LabWare to court costs.  The Pennsylvania Supreme Court has held that "when nominal damages are awarded in our courts, one dollar shall be the measure thereof."  *Stevenson v. Econ. Bank of Ambridge*, 197 A.2d 721, 728 (Pa. 1964); *see also United States ex rel. Tyrrell v. Speaker*, 535 F.2d 823, 830 n.13 (3d Cir. 1976).  A judgment for nominal damages, moreover, "may, in the discretion of the court, carry with it an award of court costs."  RESTATEMENT (SECOND) OF CONTRACTS § 346 cmt. b (1981).  In fact, courts "ordinarily" decide to award costs in this scenario.

24

*FDC Benefit Adm'rs, Inc. v. George Washington Univ.*, 209 F. Supp. 2d 232, 245 (D.D.C. 2002);

*see also Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1321 (11th Cir. 2001) ("Cases from this and

other circuits consistently support shifting costs if the prevailing party obtains judgment on even a

fraction of the claims advanced."); *Nemitz v. Reuben H. Donnelly Corp.*, 310 A.2d 376, 379 (Pa.

Super. Ct. 1973) ("[I]n no event can a verdict for the defendant be justified in a case where the

breach of contract is admitted.  Plaintiff was, at the least, entitled to nominal damages which verdict

would carry costs.").  Accordingly, the Court holds that LabWare may recover costs on its breach

of contract claim as set forth in Federal Rule of Civil Procedure 54(d)(1).[7]


## III.   CONCLUSION

For the reasons stated above, judgment is entered for Thermo and against LabWare on

LabWare's false advertising claims, and judgment is entered for LabWare and against Thermo on

Labware's breach of contract claim.  An appropriate Order follows.

---

[7] This holding should not be construed to mean that LabWare is also entitled to attorneys' fees pursuant to Federal Rule of Civil Procedure 54(d)(2).  To the contrary, "[w]hen a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable [attorney's] fee is usually no fee at all."  *Farrar v. Hobby*, 506 U.S. 103, 115 (1992).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LABWARE, INC.,** | : | |
| Plaintiff, | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **THERMO LABSYSTEMS, INC.,** | : | **No. 04-2545** |
| Defendant. | : | |

<u>**ORDER**</u>

**AND NOW**, this **28**[th] day of **June, 2005**, upon consideration of LabWare, Inc.'s ("LabWare") supplemented proposed Findings of Fact and Conclusions of Law, Thermo Labsystems, Inc.'s ("Thermo") post-trial proposed Findings of Fact and Conclusions of Law, following a bench trial on the merits, and for the foregoing reasons, it is hereby **ORDERED** that:

1.    Judgment is entered in favor of Thermo and against LabWare on LabWare's false advertising claims (Count I of the Second Amended Complaint).

2.    Judgment is entered in favor of LabWare and against Thermo on LabWare's claim for breach of contract (Count II of the Second Amended Complaint).

    a.    LabWare is awarded nominal damages for this claim in the amount of one dollar ($1.00).

    b.    LabWare may recover court costs for this claim as set forth in Federal Rule of Civil Procedure 54(d)(1).

3.    LabWare's Motion for Leave to File a Reply to Thermo's Opposition to LabWare's Motion for Leave to Supplement the Joint Pretrial Disclosure Statement (Document No. 59) is **DENIED** as **moot**.

4.      The Clerk of Court is directed to close this case.


                        **BY THE COURT:**


                        _____
                        **Berle M. Schiller, J.**